# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

LOUIS LEDET                                                    CIVIL ACTION

VERSUS                                                        NO. 11-1817

BURL CAIN, WARDEN                                          SECTION "A"(2)

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings,

including an evidentiary hearing if necessary, and to submit proposed findings and

recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as

applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. It was recently

reassigned to me. Record Doc. No. 18. Upon review of the entire record, I have

determined that a federal evidentiary hearing is unnecessary. See 28 U.S.C. §

2254(e)(2).[1] For the following reasons, I recommend that the instant petition for habeas

corpus relief be **DENIED** and the petition **DISMISSED WITH PREJUDICE**.

---

[1]Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination. Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

# I. FACTUAL AND PROCEDURAL BACKGROUND

The petitioner, Louis Ledet, is incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.[2] On August 14, 2003, Ledet was charged by bill of information in the 23rd Judicial District Court for Ascension, Assumption and St. James Parishes with second degree murder.[3] The Louisiana First Circuit Court of Appeal summarized the facts of the case as follows:

> On June 18, 2003, the defendant [Louis Ledet], Alvin Dardar, and Ryan Andras, the victim, were aboard the tugboat "Captain EJ" traveling to Morgan City. The defendant was the master of the vessel, and Dardar and Andras were deckhands. There was no one else on the boat. All three were in the wheelhouse; Dardar was steering. On the dash of the wheelhouse was the defendant's .30 caliber Ruger revolver. At some point while the defendant and Andras were speaking to each other, the defendant grabbed his gun and shot Andras in the head, killing him. The defendant was taken to the hospital and treated for an avulsion injury to his left forearm.
>
> Because the precise location of the killing was not immediately discernible, law enforcement officers from St. Mary Parish, Assumption Parish, and Terrebonne Parish all investigated the crime scene. When it was determined that the killing occurred in Assumption Parish, the Assumption Parish Sheriff's Office took over the case.[4]

---

[2] Rec. Doc. No. 4.

[3] St. Rec. Vol. 1 of 16, p. 15, Bill of Information, 8/14/03.

[4] State v. Ledet, 956 So. 2d 849 (Table); 2007 WL 1300819, *1 (La. App. 1 Cir. 5/4/07); St. Rec. Vol. 11 of 16, 2006 KA 1740, pp. 2-3.

On November 10, 2003, Ledet's counsel filed a motion to suppress evidence.[5]  On or about March 23, 2004, Ledet filed a pro se amended motion to suppress.[6]   On June 30, 2004, the trial court conducted a suppression hearing and took the matter under submission.[7] By written judgment and reasons issued August 25, 2004, the district court denied Ledet's motion to suppress.[8]

On September 23, 2004, Ledet filed his notice of intent to seek a writ of review of the trial court's denial of his motion to suppress.[9]  On September 27, 2004, the district court set a return date of October 25, 2004.[10]  On October 26, 2004, defense counsel submitted via fax a motion to extend his return date.[11]  On October 29, 2004, the district court extended his time to November 10, 2004.[12]  However, on January 10, 2005, the Louisiana First Circuit refused to consider Ledet's writ application because:  (1) His request for an extension of his return date was untimely filed in violation of Rule 4-3,

---

[5]St. Rec. Vol. 1 of 16, pp. 21-22.

[6]St. Rec. Vol. 11 of 16.  Ledet did not date his pleading.  March 23, 2004 is the file-stamped date.

[7]St. Rec. Vol. 7 of 16, Motion to Suppress Transcript 6/30/04, p. 47.

[8]St. Rec. Vol. 1 of 16, pp. 39-41, Trial Court Judgment and Reasons, 8/25/04.

[9]St. Rec. Vol. 1 of 16, p. 42.

[10]St. Rec. Vol. 1 of 16, p. 43.

[11]St. Rec. Vol. 1 of 16, p. 46.

[12]Id.

Uniform Rules-Court of Appeal.[13]  (2) He failed to certify service to the trial judge in violation of Rule 4-5.  (3) He failed to attach a copy of the pertinent minute entries in violation of Rule 4-5(i).[14]  The court specified that its decision was final and that if Ledet "elects to file a new application with this Court, the application must be filed on or before January 24, 2005."[15]  On January 21, 2005, Ledet filed a new writ application with the Louisiana First Circuit.[16]  On March 21, 2005, the Louisiana First Circuit denied this writ application without assigned reasons.[17]

On April 27, 2005, Ledet's jury trial commenced,[18] and he was found guilty as charged on the following day.[19]  On November 6, 2005, Ledet was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence, with credit for time served.[20]

---

[13]The appellate court explained that Ledet's original return date was October 25, 2004. It was not until October 26, 2004, that defense counsel faxed his motion for an extension of the return date and the trial court did not receive the original motion until October 27, 2004.

[14]St. Rec. Vol. 1 of 16, p. 61, La. App. 1st Cir. Order, 2004 KW 2470, 1/10/05.

[15]Id.

[16]St. Rec. Vol. 10 of 16, 2005 KW 0157.

[17]St. Rec. Vol. 1 of 16, p. 62, La. App. 1st Cir. Order, 2005 KW 0157, 3/21/05.

[18]St. Rec. Vol. 1 of 16, p. 115, Title page stating trial start date.

[19]Id. at p. 91, Verdict of jury.

[20]Id. at pp. 97-98, Reasons for Sentence.

On November 10, 2005, Ledet's counsel filed a notice of appeal.[21]  On November 16, 2005, the district court granted an appeal, setting a return date "within the time delays provided by law."[22]  On December 27, 2005, a "Notice of Appeal" was issued by the "Appeal Department, Clerk of the 23rd Judicial District Court," setting Ledet's return date on March 16, 2006.[23]  Thereafter, Ledet's deadline was extended to October 10, 2006.[24]

On October 10, 2006, counsel filed Ledet's appeal brief, raising the following claims:[25]  (1) The evidence was insufficient to support the conviction.  (2) The trial court erred in admitting evidence of "other crimes," namely Ledet's alleged sale of cocaine to Eugene Marcel.  (3) The trial court erred in admitting evidence of "other crimes," namely Ledet's alleged sale of cocaine to Ryan Andras.  (4) The trial court erred in admitting evidence of "other crimes," namely an alleged threat made by Ledet to Andras before the killing. (5) The trial court erred in denying Ledet's motion to suppress.  On

---

[21]Id. at p. 99, Notice of Appeal.

[22]Id. at p. 100, Order setting return date.

[23]Id. at p. 104, Notice of Return Date.

[24]St. Rec. Vol. 11 of 16, Order granting extension of time.

[25]Id.  Appeal Brief, 2006 KA 1740, 10/10/06; State v. Ledet, 2007 WL 1300819 at *1; St. Rec. Vol. 11 of 16, 2006 KA 1740, p. 2.

May 4, 2007, the Louisiana First Circuit affirmed Ledet's conviction and sentence, finding no merit to Ledet's claims.[26]

On June 1, 2007, Ledet's counsel filed a writ application with the Louisiana Supreme Court, raising the same claims he had presented to the state appellate court.[27] On December 7, 2007, the Louisiana Supreme Court denied Ledet's writ application without assigning reasons.[28]

Ledet's conviction became final 90 days later, on March 6, 2008, when he did not file a writ application with the United States Supreme Court. Roberts v. Cockrell, 319 F.3d 690, 694 (5th Cir. 2003) (citing 28 U.S.C. § 2244(d)(1)(A); Flanagan v. Johnson, 154 F.3d 196, 200-01 (5th Cir. 1998)); Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999) (citing 28 U.S.C. § 2244(d)(1)(A)); U.S. Sup. Ct. R. 13(1).

On December 4, 2008, Ledet filed an application for post-conviction relief in the state trial court.[29] Ledet claimed that he received ineffective assistance of counsel at trial because his counsel failed to (1-A) investigate and offer witnesses that would contradict State witnesses; (1-B) investigate and offer evidence that the killing was an accident; (1-

---

[26]State v. Ledet, 2007 WL 1300819 at * 1-11; St. Rec. Vol. 11 of 16, 2006 KA 1740, pp. 3-18.

[27]St. Rec. Vol. 11 of 16, 2007 K 1154.

[28]State v. Ledet, 969 So.2d 627 (La. 2007); St. Rec. Vol. 11 of 16, Supreme Court Opinion, 2007 K 1154, 12/7/07.

[29]St. Rec. Vol. 12 of 16, Uniform Application for Post-Conviction Relief (signed 12/4/08).

C) develop a meaningful relationship with him to attain his trust and learn information critical to the defense; (1-D) object when the district attorney posted pictures in front of the jury that had no evidentiary value and were only meant to prejudice the jury; (1-E) exercise peremptory challenges to exclude biased jurors; (1-F) move for a mistrial or dismissal of the jury pool that heard prejudicial comments; and (1-G) pursue supervisory writs based on the trial court's denial of his motion to suppress. Ledet also raised the following grounds for relief: (2) He received ineffective assistance of <u>appellate</u> counsel. (3) He was denied a fair and impartial jury. (4) He was denied a fair trial by virtue of the testimony of Dr. William Newman concerning his intent. (5) The trial court erred in allowing the hearsay testimony of Dr. Marie Chaudoir. (6) He was denied due process because of improper actions of the prosecution. (7) He was denied his right to judicial review because bench conference discussions were not transcribed. On March 4, 2009, Ledet filed a supplemental brief raising two additional claims: (1-H) He received ineffective assistance of counsel and he was denied judicial review as a result of the Louisiana First Circuit's refusal to consider his writ application because counsel was untimely in seeking an extension of time. (8) He was denied his right to a fundamentally fair trial.[30]

---

[30]Rec. Doc. No. 4-4, pp. 58-69, "Supplemental Issue to Memorandum of Law Supporting an Application for Post-Conviction Relief Presently Pending Before this Court."

On November 10, 2009, the State filed an opposition to Ledet's post-conviction application.[31]  On November 19, 2009, Ledet's counsel filed a response to the State's opposition, consolidated with a supplemental application for post-conviction relief, arguing that trial counsel was ineffective in failing properly to investigate, to search for both fact and character witnesses, and to locate and hire an expert witness,  and arguing that he was entitled to an evidentiary hearing.[32]  On February 5, 2010, the state trial court denied all of Ledet's claims as without merit.[33]

On February 24, 2010, Ledet timely filed[34] a pro se writ application to the Louisiana First Circuit Court of Appeal.[35]  Though some were numbered differently, Ledet raised the same claims that he had raised in the district court.  On April 29, 2010, his counsel filed a supplemental writ application, asserting the same claims raised before the district court, along with a claim that the admission of the hearsay testimony of Dr. Marie Chaudoir constituted a violation of Ledet's constitutional right to confront

[31]Id. at pp. 19-22, Answer and Memorandum in Opposition to Defendant's Application for Post-Conviction Relief.

[32]Id. at pp. 39-45, Defendant's Response to State's Opposition to Defendant's Original Application for Post-Conviction Relief c/w Defendant's Supplemental Application for Post-Conviction Relief.

[33]St. Rec. Vol. 12 of 16, District Court Ruling, signed 2/5/10.

[34]Ledet had 30 days from issuance of the trial court's order to file for review in the Louisiana First Circuit. La.App. Rule 4-3, which he did.

[35]St. Rec. Vol. 14 of 16, 2010 KW 0392.

witnesses.[36]  On June 21, 2010, the Louisiana First Circuit issued an order, stating that Ledet's "[w]rit [was] denied in part and denied on the showing made in part."[37]  The appellate court explained:

> Relator's supplemental counseled claims of ineffective counsel are denied on the showing made as relator failed to provide this Court with a copy of the trial transcript, minute entries, and other portions of the district court record that might support these claims. Supplementation of this writ application and/or an application for rehearing will not be considered.  <u>See</u> Uniform Rules of Louisiana Courts of Appeal, Rules 2-18.7 & 4-9.  Any future filing on this issue should include the entire contents of this application, the missing items noted above, and a copy of this ruling.  In the event relator elects to file a new application with this Court, the application must be filed on or before July 20, 2010.  The remainder of relator's writ application is denied.[38]

On July 20, 2010, Ledet's counsel filed a supplemental writ application, arguing that the trial court erred in failing to hold an evidentiary hearing on Ledet's ineffective assistance of counsel claim and that counsel's failure to "brief a violation of Mr. Ledet's confrontation clause rights" constituted ineffective assistance of appellate counsel.[39]  On

---

[36]Rec. Doc. No. 4-5, pp. 64-78, 2010 KW 0392. There is no evidence that Ledet's claim of a Confrontation Clause violation was raised before the state district court.

[37]St. Rec. Vol. 14 of 16, 2010 KW 0392, 1st Cir. Opinion, 6/21/10.

[38]<u>Id</u>.

[39]St. Rec. Vol. 15 of 16, 2010 KW 1300.

November 22, 2010, the Louisiana First Circuit denied the writ without assigned reasons.[40]

On December 21, 2010, Ledet's counsel timely filed[41] an application for a writ of certiorari with the Louisiana Supreme Court, raising the same claims asserted before the Louisiana First Circuit Court of Appeal.[42]   On June 24, 2011, the Louisiana Supreme Court denied this writ application without assigning reasons.[43]

On December 22, 2010,[44] Ledet filed a separate timely pro se application for a writ of certiorari with the Louisiana Supreme Court, raising the same claims he had raised before the Louisiana First Circuit.[45]   On January 13, 2012, the Louisiana Supreme Court denied Ledet's pro se writ application without assigning reasons.[46]

---

[40]St. Rec. Vol. 16 of 16, , 2010 KW 1300 (La. App. 1 Cir. 11/22/10).

[41]Ledet had 30 days from the issuance of the appellate court's order to file for review in the Louisiana Supreme Court.  La. S. Ct. Rule X § 5(a), and he did so.

[42]St. Rec. Vol. 16 of 16, 2010 KP 2811.

[43]State v. Ledet, 64 So.3d 217 (La. 2011), St. Rec. Vol. 16 of 16, Supreme Court Opinion, 2010 KP 2811, 6/24/11.

[44]Ledet did not date this writ application. December 22, 2010 is the post-marked date of his writ application.

[45]St. Rec. Vol. 16 of 16, 2010 KH 2843.

[46]State ex rel. Ledet v. State, 77 So.3d 961 (La. 2012), 2010 KH 2843.  The Louisiana Supreme Court's January 13, 2012 decision is not contained in the state record because it was issued after Ledet filed his habeas petition in this court and after the State filed its response.

## II.  FEDERAL HABEAS PETITION

On August 25, 2011, the clerk of this court filed Ledet's petition for federal habeas corpus relief in which he raises the following grounds for relief:  (1) There was insufficient evidence to support his conviction.  (2) The trial court erred in admitting evidence of "other crimes," namely his sale of cocaine to Eugene Marcel.  (3) The trial court erred in admitting evidence of "other crimes," namely his alleged sale of cocaine to Ryan Andras.  (4) The trial court erred in admitting evidence of "other crimes," namely an alleged threat he made to Andras before the incident at issue.  (5) The trial court erred in denying his motion to suppress.  (6) He was denied effective assistance of trial counsel because his counsel failed to (a) investigate and offer witnesses that would contradict State witnesses; (b) investigate and offer witnesses that the killing was an accident; (c) develop a meaningful relationship with him in order to attain his trust and learn information critical to the defense; (d) object when the prosecutor posted pictures in front of the jury that had no evidentiary value and were only meant to prejudice the jury; (e) exercise peremptory challenges to exclude biased jurors; (f) move for a mistrial or dismissal of the jury pool that heard prejudicial comments; (g) and (i) pursue supervisory writs based on the trial court's denial of his motion to suppress; and (h) properly investigate and search for fact and character witnesses, and obtain an expert witness.  (7) He was denied effective assistance of appellate counsel.  (8) He was denied

a fair and impartial jury.  (9) He was denied a fair trial by virtue of the testimony of Dr. William Newman concerning his intent.  (10) The trial court erred in allowing Dr. Marie Chaudoir to offer hearsay testimony in violation of state evidentiary rules and his right to confront witnesses.  (11) He was denied due process because of the improper actions of the prosecution. (12) He was denied his right to judicial review because bench conference discussions were not transcribed. (13) He was denied his right to a fundamentally fair trial.[47]

The State filed a response in opposition to Ledet's petition, arguing that his petition was untimely, that he had not exhausted all of his claims, and that his claims are without merit.[48]

## III.   GENERAL STANDARDS OF REVIEW

The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254.  The AEDPA went into effect on April 24, 1996[49] and applies to habeas petitions filed after that date.  Flanagan v. Johnson, 154 F.3d 196, 198 (5th Cir. 1998) (citing Lindh v. Murphy, 521 U.S. 320 (1997)).  The AEDPA therefore applies to

---

[47]Rec. Doc. No. 4-1.

[48]Rec. Doc. No. 12.

[49]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  United States v. Sherrod, 964 F.2d 1501, 1505 (5th Cir. 1992).

Ledet's petition, which, for reasons discussed below, is deemed filed in this federal court on July 21, 2011.[50]

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claims raised by the petitioner were adjudicated on the merits in state court; i.e., the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim. Nobles v. Johnson, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c). The State argues that all of Ledet's claims are untimely and that some claims have not been exhausted. For the reasons outlined below, however, I find that Ledet's petition was timely filed in this court and that his claims have been exhausted.

---

[50]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se. Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. Coleman v. Johnson, 184 F.3d 398, 401 (5th Cir. 1999), cert. denied, 529 U.S. 1057 (2000); Spotville v. Cain, 149 F.3d 374, 378 (5th Cir. 1998); Cooper v. Brookshire, 70 F.3d 377, 379 (5th Cir. 1995). Ledet's petition was filed by the clerk of court on August 25, 2011, when he paid the filing fee. Ledet dated his signature on the petition on July 21, 2011. Record Doc. No. 4 at p. 10. This is the earliest date appearing in the record on which he could have delivered his pleadings to prison officials for mailing. The fact that he did not pay the filing fee until August 25, 2011, does not alter the application of the mailbox rule to his pro se petition. See Cousin v. Lensing, 310 F.3d 843 (5th Cir. 2002) (mailbox rule applies even if inmate did not pay the filing fee at the time of mailing) (citing Spotville, 149 F.3d at 374).

IV.    TIMELINESS

The AEDPA requires a petitioner to bring his Section 2254 petition within one year of the date his conviction became final.[51]  Duncan v. Walker, 533 U.S. 167, 179-80 (2001).  The State argues that Ledet's conviction became final on December 21, 2007, when his 14-day period for seeking a rehearing of the Louisiana Supreme Court's December 7, 2007 decision denying his writ application expired.[52]  However, as the Fifth Circuit explained in Roberts, 319 F.3d at 694 (footnotes omitted):

> We find no reason to look to state law to determine when a state conviction becomes final for the purposes of § 2244(d)(1)(A). The language of § 2244(d)(1)(A) provides that a decision becomes final "by the conclusion of direct review or the expiration of the time for seeking such review."  We previously held that direct review includes a petition for writ of certiorari

---

[51]The statute of limitations provision of the AEDPA provides for other triggers which do not apply here:
(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of--
A.      the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
B.      the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State actions;
C.      the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review;  or
D.      the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.  28 U.S.C. § 2244(d).

[52]Rec. Doc. No. 12, p. 14. Under La.Code Crim. P. art. 922, a party has 14 days to seek a rehearing.

14

to the Supreme Court. Therefore, the "conclusion of direct review" is when the Supreme Court either rejects the petition for certiorari or rules on its merits. If the conviction does not become final by the conclusion of direct review, it becomes final by "the expiration of the time for seeking such review." We previously held that this includes the ninety days allowed for a petition to the Supreme Court following the entry of judgment by the state court of last resort.

Accordingly, Ledet's conviction was final, and his one-year statute of limitations commenced to run, on March 6, 2008, when he did not pursue review of the Louisiana Supreme Court's order affirming his sentence and conviction in the United States Supreme Court. Thus, under a literal application of the statute, Ledet had one year from the date his conviction became final, or until March 6, 2009, to file his federal habeas corpus petition, which he did not do. His petition must be dismissed as untimely, unless the one-year statute of limitations period was interrupted or otherwise tolled in either of the following two ways recognized in the applicable law.

First, the United States Supreme Court has held that the one-year statute of limitations period in Section 2244(d)(1) of the AEDPA may be equitably tolled, but only when the petitioner has pursued his rights diligently and rare or extraordinary circumstances exist which prevented timely filing. Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005); Fisher v. Johnson, 174 F.3d 710, 713 (5th Cir. 1999), cert. denied, 531 U.S. 1164 (2001); Cantu-Tzin v. Johnson, 162 F.3d 295, 299 (5th Cir. 1998); Davis v. Johnson, 158 F.3d 806, 810 (5th Cir. 1998), cert. denied, 526 U.S. 1074 (1999).

Equitable tolling is warranted <u>only</u> in situations where the petitioner was actively misled or is prevented in some extraordinary way from asserting his rights. <u>Pace</u>, 544 U.S. at 418-19; <u>Cousin</u>, 310 F.3d at 848. In this case, Ledet offers no basis for equitable tolling nor has my review of the record uncovered the kind of rare or extraordinary circumstances that might warrant equitable tolling.

In addition to equitable tolling, however, the AEDPA itself provides for interruption of the one-year limitations period, in stating that "[t]he time during which a <u>properly filed application for State post-conviction or other collateral review</u> with respect to the pertinent judgment or claim is pending <u>shall not be counted</u> toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2) (emphasis added). By its plain language, this provision does <u>not</u> create a new, full, one-year term within which a federal habeas petition may be filed at the conclusion of state court post-conviction proceedings. <u>Flanagan</u>, 154 F.3d at 199 n.1. The Supreme Court has clearly described this provision as a tolling statute. <u>Duncan</u>, 533 U.S. at 175-178.

The decisions of the Fifth Circuit and other federal courts have held that because this statute is a tolling provision, the time during which state court post-conviction proceedings are pending must merely be subtracted from the one-year limitations period:

> [Section] 2244(d)(2) provides that the period during which a properly filed state habeas application is pending must be excluded when calculating the one[-]year period. Under the plain language of the statute, any time that passed between the time that [petitioner's] conviction became final and the

time that his state application for habeas corpus was properly filed must be counted against the one[-]year period of limitation.

Flanagan, 154 F.3d at 199 n.1; accord Brisbane v. Beshears, 161 F.3d 1, 1998 WL 609926 at *1 (4th Cir. Aug. 27, 1998) (Table, Text in Westlaw); Gray v. Waters, 26 F. Supp.2d 771, 771-72 (D. Md. 1998).

For a post-conviction application to be considered "properly filed" within the meaning of Section 2244(d)(2), the applicant must "'conform with a state's applicable procedural filing requirements,'" such as timeliness and location of filing. Pace, 544 U.S. at 414 ("When a postconviction application is untimely under state law, 'that [is] the end of the matter' for purposes of § 2244(d)(2)"); Williams v. Cain, 217 F.3d 303, 306-307 n.4 (5th Cir. 2000) (quoting Villegas v. Johnson, 184 F.3d 467, 469 (5th Cir. 1999)); Smith v. Ward, 209 F.3d 383, 384-85 (5th Cir. 2000). The timeliness consideration in Louisiana, for purposes of the AEDPA, requires application of a prison mailbox rule to state pleadings. Causey v. Cain, 450 F.3d 601, 604-05 (5th Cir. 2006).

A matter is "pending" for Section 2244(d)(2) purposes "as long as the ordinary state collateral review process is 'in continuance.'" Carey v. Saffold, 536 U.S. 214, 219-20 (2002); Williams, 217 F.3d at 310 (a matter is "pending" for Section 2244(d)(2) purposes until "'further appellate review [is] unavailable under [Louisiana's] procedures.'")

In this case, the State has made a detailed timeliness calculation in which it concludes that Ledet allowed a total of 422 days to lapse between finality of his conviction and the mailbox rule submission date of his federal habeas petition to this court.[53] Thus, the State argues that Ledet missed the AEDPA statute of limitations deadline (365 days from finality of his conviction) by 57 days. For the following reasons, however, I cannot accept the State's calculation.

Ledet commenced his state court post-conviction proceedings on December 4, 2008, when he filed his application with the state district court. At that point, 293 days (from the March 6, 2008 finality date) of his 365-day statute of limitations had expired. Thereafter, giving Ledet tolling credit for the 30-day periods he had to seek post-conviction relief from the state appellate court and state supreme court, his statute of limitations period remained tolled the entire time his timely filed post-conviction proceedings were pending in the state court system. Ledet's post-conviction proceedings remained pending until January 13, 2012, after he filed the instant action.[54]

Accordingly, I find that Ledet's federal habeas petition is not time-barred and the State's defense in this regard should not be accepted.

_____

[53]Rec. Doc. No. 12, pp. 14-15.

[54]On June 24, 2011, the Louisiana Supreme Court denied the writ application, 2010 KP 2811, filed by counsel on Ledet's behalf. See Ledet, 64 So.3d 217. Ledet filed the instant action approximately two months later, August 25, 2011. However, Ledet's pro se writ application, 2010 KH 2843, which was properly filed, remained pending before the state high court until January 13, 2012. See Ledet, 77 So.3d 961.

V.    EXHAUSTION

"A fundamental prerequisite to federal habeas relief under § 2254 is the exhaustion of all claims in state court prior to requesting federal collateral relief."  Whitehead v. Johnson, 157 F.3d 384, 387 (5th Cir. 1998) (citing Rose v. Lundy, 455 U.S. 509, 519-20 (1982)); accord Preiser v. Rodriguez, 411 U.S. 475, 500 (1973); Nobles, 127 F.3d at 419. "A federal habeas petition should be dismissed if state remedies have not been exhausted as to all of the federal court claims."  Whitehead, 157 F.3d at 387 (citing 28 U.S.C. § 2254(b)(1)(A); Rose, 455 U.S. at 519-20).

The exhaustion requirement is satisfied when each claim is raised at each level of the Louisiana courts.  See O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); Baldwin v. Reese, 541 U.S. 27, 32 (2004).  "State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," including discretionary review when that review is part of the State's ordinary appellate review procedures.  O'Sullivan, 526 U.S. at 845; accord Duncan v. Walker, 533 U.S. 167, 177-79 (2001).

The State argues that Ledet failed to invoke "one complete round of the State's established appellate review process" because his "claims herein (Claim Nos. 6-13) are still pending before the supreme court, State of Louisiana, under State v. Ledet, 2010 KH

2843."[55]  In response to the State's argument, Ledet filed a "motion to stay and hold in abeyance" his federal habeas petition until he had properly exhausted his state court remedies.[56]  Thereafter, Ledet filed a motion to expand the record,[57] attaching a copy of the Louisiana Supreme Court's January 13, 2012 order in State ex rel. Ledet v. State, No. 2010 KH 2843 (La. 2012), denying his writ application.[58]  Ledet also filed a motion to withdraw his motion to stay, explaining that he "has now exhausted all claims in the state court."[59]  Ledet's motion to expand the record and motion to withdraw his motion to stay were granted.[60]

Based upon the above, it is evident that Ledet has now exhausted his state court remedies with respect to his Claim Nos. 6-13.

I find, however, that Ledet has not exhausted his state court remedies with regard to a portion of his Claim No. 10, in which he asserts that his right of confrontation was denied by virtue of the trial court's erroneous admission of Dr. Marie Chaudoir's hearsay

---

[55]Rec. Doc. No. 12, p. 18.

[56]Rec. Doc. No. 14.

[57]Rec. Doc. No. 15.

[58]Id. at p. 5.

[59]Rec. Doc. No. 16, p. 3.  The State filed no objections to Ledet's motion to expand the record and motion to withdraw his motion to stay.

[60]Rec. Doc. No. 17.

testimony. My review of the state court record indicates that Ledet's claim in this regard was not raised before the state district court. However, because this claim is without merit, I will address it without requiring full exhaustion. 28 U.S.C. § 2254(b)(2). Accordingly, I will proceed to address the merits of all of Ledet's claims.

VI.    STANDARDS OF MERITS REVIEW

28 U.S.C. §§ 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law in federal habeas corpus proceedings. Nobles, 127 F.3d at 419-20 (citing 28 U.S.C. § 2254(b) and (c)).

Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2)), cert. denied, 532 U.S. 1039 (2001). The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption. 28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly

established [Supreme Court precedent.]'" <u>Penry v. Johnson</u>, 215 F.3d 504, 507 (5th Cir. 2000) (quoting <u>Miller v. Johnson</u>, 200 F.3d 274, 280-81 (5th Cir.), <u>cert. denied</u>, 531 U.S. 849 (2000)), <u>aff'd in part, rev'd in part on other grounds</u>, 532 U.S. 782 (2001); <u>Hill</u>, 210 F.3d at 485. The United States Supreme Court has clarified the Section 2254(d)(1) standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Williams v. Taylor</u>, 529 U.S. 362, 405-06, 412-13 (2000); <u>Penry</u>, 532 U.S. at 792-93; <u>Hill</u>, 210 F.3d at 485. "'A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state court decision applied [a Supreme Court case] incorrectly.'" <u>Price v. Vincent</u>, 538 U.S. 634, 641 (2003) (quoting <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-25 (2002)) (brackets in original); <u>Bell v. Cone</u>, 535 U.S. 685, 699 (2002). Rather, under the "unreasonable application" standard, "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable." <u>Neal v. Puckett</u>, 286 F.3d 230, 246 (5th Cir. 2002), <u>cert. denied</u>, <u>sub nom</u>, <u>Neal v. Epps</u>, 537 U.S. 1104 (2003). The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively

unreasonable manner.  <u>Price</u>, 538 U.S. at 641 (quoting <u>Woodford</u>, 537 U.S. at 24-25);

<u>Wright v. Quarterman</u>, 470 F.3d 581, 585 (5th Cir. 2006).

VII.    <u>INSUFFICIENT EVIDENCE (CLAIM NOS. 1 AND 13)</u>[61]

Ledet argues that the evidence at trial was insufficient to support his second degree

murder conviction.  Under <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979), this court must

determine, after viewing the evidence in the light most favorable to the prosecution,

whether a rational trier of fact could have found that the essential elements of the crime

were proven beyond a reasonable doubt.  <u>Id.</u>, 443 U.S. at 319; <u>Perez v. Cain</u>, 529 F.3d

588, 594 (5th Cir. 2008); <u>Williams v. Cain</u>, 408 Fed. Appx. 817, 821 (5th Cir. 2011).

Thus, to determine whether commission of a crime is adequately supported by the record,

the court must review the substantive elements of the crime as defined by state law.

<u>Perez</u>, 529 F.3d at 594 (citing <u>Jackson</u>, 443 U. S. at 324 n. 16).  The court's consideration

of the sufficiency of the evidence extends only to what was presented at trial.  <u>See</u>

<u>McDaniel v. Brown</u>, 558 U.S. 120, 130 S.Ct. 665, 672, 674 (2010) (a reviewing court

must consider the trial evidence as a whole under <u>Jackson</u>); <u>Johnson v. Cain</u>, 347 Fed.

---

[61]In Claim No. 13, Ledet broadly contends that he was denied his right to a fundamentally fair trial.  Rec. Doc. 4-1, p. 72. However, a review of this "claim" reflects that Ledet is simply rehashing some of his earlier claims.  For example, Ledet attacks the credibility of the State's primary witness, Alvin Dardar.  Because Ledet, by virtue of his challenge to Dardar's credibility, is questioning the sufficiency of a key element of the State's case, this portion of Claim No. 13 will be addressed here.

Appx. 89, 91 (5th Cir. 2009) (Jackson standard relies "upon the record evidence adduced at the trial.") (quoting Jackson, 443 U.S. at 324).

Review of the sufficiency of the evidence, however, does not include review of the weight of the evidence or the credibility of the witnesses, because those determinations are the exclusive province of the jury. United States v. Young, 107 Fed. Appx. 442, 443 (5th Cir. 2004) (citing United States v. Garcia, 995 F.2d 556, 561 (5th Cir. 1993); see also Jackson, 443 U.S. at 319 (noting that it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts"). Thus, all credibility choices and conflicting inferences must be resolved in favor of the verdict. Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005).

A reviewing federal habeas court is not authorized to substitute its interpretation of the evidence or its view of the credibility of witnesses for that of the fact-finder. Alexander v. McCotter, 775 F.2d 595, 598 (5th Cir. 1985). In addition, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit.'" Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)).

Ledet was charged with and convicted of second degree murder.  Under La. Rev. Stat. § 14:30.1, second degree murder is defined, in pertinent part, as follows:[62] "A. Second degree murder is the killing of a human being:  (1) When the offender has a specific intent to kill or to inflict great bodily harm[.]"  Specific intent "is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."  La. Rev. Stat. §14:10(1).[63]  Under Louisiana law, intent need not be proven directly but may be inferred from the actions of the defendant and the circumstances surrounding those actions.  State v. Tate, 851 So.2d 921, 930 (La. 2003) (citing State v. Brooks, 505 So.2d 714, 717 (La. 1987)); State v. Sharlhorne, 554 So.2d 1317, 1321 (La. App. 1st Cir. 1989).  As the Louisiana First Circuit observed in addressing the instant claim:

> The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness.  Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency.  The trier of fact's determination of the weight to be given evidence is not subject to appellate review.  An appellate court will not reweigh the evidence to overturn a factfinder's determination of guilt.  State v. Taylor, 97-2261, pp. 5-6 (La. App. 1st Cir. 9/25/98), 721 So.2d 929, 932.
> We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases.  See State v. Mitchell, 99-3342, p. 8 (La.10/17/00), 772 So.2d 78, 83.  The fact that the

---

[62]This was the instruction provided to the jury.  St. Rec. Vol. 4 of 16, p. 668.

[63]This was the instruction provided to the jury.  Id. at p. 669.

record contains evidence which conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. <u>State v. Quinn</u>, 479 So.2d 592, 596 (La.App. 1st Cir. 1985).

When a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. <u>State v. Captville</u>, 448 So.2d 676, 680 (La. 1984). In the instant matter, the defendant's hypothesis of innocence was based on the theory that the shooting of Andras was accidental.[64]

Ledet asserts that the State failed to prove he was guilty of second degree murder because it failed to establish that he specifically intended to kill the victim. Instead, he argues the evidence reflected that he and the victim were engaged in "horseplay" and the gun accidently went off, fatally shooting the victim.

In support of his argument, Ledet relies heavily on the first statement of the only witness to the incident, Alvin Dardar, provided to Captain Malcolm Wolfe. In this recorded statement, Dardar characterized Ledet's interaction with the victim, Ryan Andras, as horseplay and stated that he believed that Andras had the gun in his hand before the shot was fired.[65] Ledet argues that Dardar's statement "points to the conclusion that the shooting was unintentional and accidental."[66] Ledet also attacks the credibility of Dardar's trial testimony and subsequent statements which differed from his

---

[64]<u>Ledet</u>, 2007 WL 1300819 at *2; St. Rec. Vol. 11 of 16, 2006 KA 1740, pp. 4-5.

[65]Rec. Doc. No. 4-1, pp. 88-89.

[66]<u>Id</u>. at p. 8.

initial statement. Ledet asserts that in later statements Dardar was simply "telling police . . . what he thought they wanted hear" and that, by the time of trial, Dardar had "lied so many times that he was not sure what the truth was anymore."[67]

Ledet also points to evidence reflecting that there were gunpowder burns on the victim's hands. The trial transcript reflects that Vicki Hall, an expert in gunshot residue evidence,[68] testified that "gunshot residue particles" were found on both of the victim's palms, "which indicates that this person had their hands in close proximity to a discharging firearm or has handled a recently fired weapon."[69] According to Ledet, the fact that the victim's palms had gunshot residue particles supports Dardar's statement "that Andras and Ledet were struggling over the weapon and both of their hands were on the weapon. This again points to the fact that the shooting was unintentional and accidental."[70]

Ledet also highlights the expert testimony of pathologist, Dr. William Newman, who testified that there was a muzzle imprint on the victim's skull, "which tells us this was a very tight contact gunshot wound."[71] According to Ledet, this evidence supports

---

[67]Id. at p. 74.

[68]St. Rec. Vol. 3 of 16, pp. 563-64.

[69]Id. at pp. 566-67.

[70]Rec. Doc. No. 4-1, p. 8.

[71]St. Rec. Vol. 3 of 16, p. 525.

a finding that Andras "was horseplaying an[d] trying to get the gun . . . . It is a reasonable hypothesis that the weapon discharged when Andras hit or pulled the weapon which is corroborated by Dardar's statement . . . . All of which is consistent with the conclusion that the shooting was unintentional and accidental."[72]

Finally, Ledet relies upon his own trial testimony, in which he described his interaction with the victim as "horseplay" and denied that he intentionally murdered the victim.[73] Ledet admitted that he cocked the gun, but had no recollection as to what happened next.[74]

In denying Ledet's insufficiency claim, the Louisiana First Circuit reviewed the testimony of several detectives regarding Ledet's differing versions of events which led to Andras's death. Ledet told Detective Gary Driskall that "Mr. Andras was trying to get the weapon from him, and he . . . pulled the weapon away from Mr. Andras, and the weapon went off, and he was also shot in the process."[75] Ledet told Detective Michael Brown that he advised Andras to leave the gun alone, but Andras refused. When Andras reached for the gun, Ledet grabbed it, pointing it toward the ceiling, but somehow during

---

[72]Rec. Doc. 4-1, pp. 8-9.

[73]St. Rec. Vol. 4 of 16, p. 632 and 647.

[74]Id. at p. 633.

[75]St. Rec. Vol. 3 of 16, p. 425. Ledet, 2007 WL 13007819 at *2; St. Rec. Vol. 11 of 16, 2006 KA 1740, p. 5.

the struggle "the gun went off."[76]   According to Detective Dawn Bergeron, Ledet

informed her that he told Andras that he could not play with the gun and an argument

ensued, at which point Ledet "picked up the gun and held it in the air."   They continued

to argue about who could touch the gun and Ledet, "to get his point across . . . cocked the

hammer."   Ledet pointed the gun at Andras, put "his finger on the trigger," then flinched

and the gun fired.[77]   Finally, Sergeant Byron Parker, who transported Ledet to the

hospital, testified that Ledet informed him that Andras was "messing" with him.   In

response, Ledet told Andras that he "was going to make him see God," which meant that

Ledet was going to kill Andras.[78]

Other relevant testimony came from deckhands Eugene Marcel and Alvin Dardar.

Marcel, who was on the boat about one week before the incident, stated that he and

Andras were cooking breakfast and Ledet joined them.   He said Ledet took Marcel

upstairs to the wheelhouse and showed Marcel his stash of cocaine.   He testified that

Ledet asked if Marcel thought Andras used cocaine, and Marcel replied that he did not

know, but he was sure Andras "wouldn't say anything."   Thereafter, they went back to the

galley and Ledet and Andras "had a couple of words."   Ledet went back upstairs and

---

[76]Id. at p. 460.   Id.

[77]Id. at pp. 465-66.   Id.

[78]Id. at pp. 471-72.   Id.

returned with a gun in a blue or black knit cap and stated: "[W]hat happens here on the boat stays on this boat; otherwise you're a dead [m f]." After that, all three went upstairs, where Andras purchased a gram of cocaine from Ledet and Marcel purchased two grams.[79]

Dardar testified that he was in the wheelhouse steering the boat and Ledet was nearby. He said Andras came up and asked if they were "almost there." At that point, Ledet "put his arm around the little boy's head" and "picked up the gun and cocked the hammer back." Thereafter, Dardar heard Ledet say, "you going to see God," and then he heard a shot fired.[80]

Other evidence contradicting Ledet's version of events included the expert testimony of pathologist, Dr. William Newman. Dr. Newman testified that based upon the "muzzle imprint" on the victim's skin, "the gun was tight against the skin." Dr. Newman opined that "gunshot wounds that are accidental are usually not tight contact types of gunshot wounds."[81] Pat Lane, a firearms identification expert, testified that Ledet's gun had a "hammer and trigger pull" of about "four and a half pounds" and it was "definitely not" a hair trigger.[82]

---

[79] Id. at pp. 477-78. Ledet, 2007 WL 13007819 at *3; St. Rec. Vol. 11 of 16, 2006 KA 1740, p. 6.

[80] Id. at pp. 490, 493-94. Ledet, 2007 WL 13007819 at *3.

[81] St. Rec. Vol. 3 of 16, pp. 525 and 529. Id. St. Rec. Vol. 11 of 16, 2006 KA 1740, p. 7.

[82] St. Rec. Vol. 3 of 16, p. 587.

Viewing the evidence in the light most favorable to the prosecution, I find that there was more than sufficient evidence upon which a rational trier of fact could have found that the essential elements of second degree murder were proven beyond a reasonable doubt. Ledet's argument in this regard is essentially that the jury should have believed his version of events that the shooting was accidental, rather than the prosecution's version that it was intentional. In short, the trial record reflects a classic credibility contest in witness testimony, including the inferences to be drawn from and the weight to be assigned to evidence. These are functions the law assigns to the jury, which resolved the arguments asserted by Ledet against him. As discussed above, this court, in reviewing a sufficiency of the evidence claim in a habeas corpus petition, does <u>not</u> review the credibility of witnesses or the factfinder's determination of the weight to be given to evidence. Such determinations are the exclusive province of the jury.

Because the state courts' rejection of Ledet's insufficient evidence claim does not represent an unreasonable application of Supreme Court law to the facts of this case, I find that Ledet's claim is without merit and does not warrant federal habeas relief.

VIII.    <u>"OTHER CRIMES" EVIDENCE (CLAIM NOS. 2, 3 AND 4)</u>

Ledet argues that the trial court erred in admitting evidence of "other crimes." Specifically, Ledet complains that the trial court erred in allowing Eugene Marcel to testify about Ledet's threat to Andras, "what happens here on the boat stays on this boat;

otherwise you're a dead [m f]."  Ledet also complains that Marcel should not have been allowed to tell jurors that Ledet sold cocaine to him and to Andras.

The admissibility of evidence of other crimes or prior bad acts at trial in Louisiana is addressed under La. Code Evid. art. 404(B).  A federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding to review errors under state law." Wilkerson v. Whitley, 16 F.3d 64, 67 (5th Cir. 1994) (quotation omitted); see also Swarthout v. Cooke, 131 S. Ct. 859, 861 (2011) (federal habeas review does not lie for errors of state law); accord Molo v. Johnson, 207 F.3d 773, 776 n.9 (5th Cir. 2000); Narvaiz v. Johnson, 134 F.3d 688, 695 (5th Cir. 1998) (citing Estelle, 502 at 67-68; Lewis v. Jeffers, 497 U.S. 764, 780 (1990); West v. Johnson, 92 F.3d 1385, 1404 (5th Cir. 1996)); see also Hogue v. Johnson, 131 F.3d 466, 506 (5th Cir. 1997) (a disagreement as to state law is not cognizable on federal habeas review).  Habeas corpus review is limited to questions of constitutional dimension, and federal courts generally do not review the admissibility of evidence under state law.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Gonzales v. Thaler, 643 F.3d 425, 429 (5th Cir. 2011); Jernigan v. Collins, 980 F.2d 292, 298 (5th Cir. 1992).

Thus, the States are free to implement procedures regarding the admission of evidence, provided those procedures do not infringe on a constitutional guarantee. Burgett v. Texas, 389 U.S. 109, 113-14 (1967); Williams v. Price, 343 F.3d 223, 230 n.3

(3d Cir. 2003); <u>Pemberton v. Collins</u>, 991 F.2d 1218, 1223 (5th Cir. 1993); <u>Nees v. Culbertson</u>, 406 F.2d 621, 625 (5th Cir. 1969); <u>Tillman v. Thaler</u>, No. A-09-CA-582-SS, 2010 WL 2731762, at *13 (W.D. Tex. July 9, 2010).  Ledet's claims concerning the allegedly erroneous admission of evidence may support federal habeas corpus relief only if the state court evidentiary rulings violate due process in such a way as to render the criminal proceedings fundamentally unfair.  <u>Lisenba v. California</u>, 314 U.S. 219, 236-37 (1941); <u>Gonzales v. Thaler</u>, 643 F.3d 425, 430 (5th Cir. 2011); <u>see also</u> <u>Peters v. Whitley</u>, 942 F.2d 937, 940 (5th Cir. 1991) (habeas corpus review is proper only to determine whether a state trial judge's error is so extreme as "to render the trial fundamentally unfair or violate an explicit constitutional right").  "Federal habeas corpus relief may be granted on erroneous state evidentiary rulings only if the challenged evidence is a crucial, critical, or highly significant factor in the context of the entire trial."  <u>Thomas v. Lynaugh</u>, 812 F.2d 225, 230 (5th Cir. 1987) (citations omitted); <u>accord</u> <u>Gonzales</u>, 643 F.3d at 430; <u>Wood v. Quarterman</u>, 503 F.3d 408, 414 (5th Cir. 2007).

The question of whether evidence is constitutionally admissible is a mixed question of law and fact.  <u>Livingston v. Johnson</u>, 107 F.3d 297, 309 (5th Cir.), <u>cert. denied</u>, 522 U.S. 880 (1997).  Under the applicable standard of review, this court therefore must determine if the state court's decision to admit the evidence is contrary to or involved an unreasonable application of Supreme Court precedent.

In State v. Prieur, 277 So.2d 126 (La.1973), the Louisiana Supreme Court held that evidence of other acts of misconduct is generally not admissible to show the defendant's bad character, but that such evidence is allowed to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is part of the subject of the present proceeding. See also La.Code Evid. art. 404(B)(1); State v. Jackson, 625 So.2d 146, 148 (La.1993).

The evidence concerning Ledet's prior bad acts did not fit the definition of prohibited acts of misconduct under Louisiana law. It was not introduced to impugn Ledet's character or depict him as a bad man. Instead, the testimony regarding his sale of cocaine aboard the boat and his threat as to what would happen if anyone revealed his illegal actions, was introduced to prove that Ledet had motive and intent to kill Andras and that the shooting was not an accident. See State v. Burge, 515 So.2d 494, 499-500 (La. App. 1 Cir. 1/14/87) (citations omitted) (evidence that defendant threatened to kill anyone who testified against him was admissible to establish motive and intent); Payne v. Tennessee, 501 U.S. 808, 825 (1991) (only when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair," does the "Due Process Clause of the Fourteenth Amendment provide[] a mechanism for relief.") (citing Darden v. Wainwright, 477 U.S. 168, 179-183 (1986)); Shattuck v. Workman, 2010 WL 4917252,

*6-7 (N.D. Okla. 2010) (admission of evidence of defendant's prior bad acts, specifically his demands for money and anger over the division of the estate, was admissible to prove motive and intent in soliciting the murder of his sister, and did not render the trial fundamentally unfair in violation of due process rights).

Ledet has not demonstrated that Marcel's testimony that Ledet sold cocaine and threatened to kill anyone who talked about it constituted prohibited evidence of prior bad acts rendering his trial fundamentally unfair. The evidence was introduced to show Ledet had motive and intent to kill the victim and that the killing was not an accident, an essential element of the burden of proof that the prosecution was required to bear. Thus, it cannot be said that any resulting prejudice from such evidence outweighed its substantial probative value to such an extent that fundamental unfairness resulted. The denial of relief on this claim was not contrary to, or an unreasonable application of, Supreme Court precedent. This claim is without merit.

IX.    DENIAL OF MOTION TO SUPPRESS (CLAIM NO. 5)

Ledet alleges that his inculpatory statements to officers were involuntary and should have been suppressed because he was under the influence of a "mind and mood altering drug" administered to him while in the hospital receiving treatment for his injury.[83] Ledet's counsel raised this claim on direct appeal. The state court found that

---

[83]Rec. Doc. No. 4-1, p. 15.

Ledet's medicated state at the hospital did not negate his comprehension or make him unconscious of the consequences of what he was saying. The court resolved that Ledet's statements were freely and voluntarily made.[84] This was the last reasoned decision on this issue.

Determining voluntariness requires the court to consider the "totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." Schneckloth v. Bustamonte, 412 U.S. 218, 224 (1973). Although mental state or condition may be a significant factor in the voluntariness determination, "this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" Carter v. Johnson, 131 F.3d 452, 462 (5th Cir. 1997) (citing Colorado v. Connelly, 479 U.S. 157, 164 (1986)).

Thus, two inquiries are involved in determining whether an accused has voluntarily and knowingly waived his Fifth Amendment privilege against self-incrimination. Moran v. Burbine, 475 U.S. 412, 421 (1986); Soffar v. Cockrell, 300 F.3d 588, 592 (5th Cir. 2002). First, the waiver of the right must be voluntary in that it was not the product of intimidation, coercion or deception. Moran, 475 U.S. at 421. Coercive police conduct is a necessary prerequisite to the conclusion that a statement was involuntary, and the

_____

[84]Ledet, 2007 WL 1300818 at *10-11; St. Rec. Vol. 11 of 16, 2006 KA 1740, pp. 14-18.

defendant must establish a causal link between the coercive conduct and the inculpatory statement. Carter, 131 F.3d at 462 (citing Connelly, 479 U.S. at 163-67). Second, the relinquishment must be made with a full awareness of the nature of the right being waived. Id.

Even if an inculpatory statement is deemed involuntary under these standards, the Supreme Court has held that its admission is a trial error subject to harmless error analysis. Arizona v. Fulminante, 499 U.S. 279, 310 (1991). Under these standards, to grant federal habeas relief, the trial error must have a substantial and injurious effect or influence in determining the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). Therefore, even if this court were to find that Ledet's Fifth Amendment rights were somehow violated, the court must also consider whether use of the statements at trial was harmless in determining the verdict. Hopkins v. Cockrell, 325 F.3d 579, 583 (5th Cir. 2003).

The admissibility of inculpatory statements is a mixed question of law and fact. Miller v. Fenton, 474 U.S. 104, 112 (1985). A federal court entertaining a collateral challenge to the voluntariness of a defendant's statements is obliged to afford a presumption of correctness to state court subsidiary findings of fact, if fairly supported in the record, Miller, 474 U.S. at 117, but the ultimate conclusion of whether, under the totality of the circumstances, the statements were voluntary is legal in nature. ShisInday

v. Quarterman, 511 F.3d 514, 522 (5th Cir. 2007), cert. denied, 555 U.S. 815 (2008) (citation omitted).  Subsidiary factual findings made by the state trial court are entitled to a presumption of correctness that may be overcome only by clear and convincing evidence.  Mitchell v. Gibson 262 F.3d 1036, 1059 (10th Cir. 2001) (citing Trice v. Ward, 196 F.3d 1151-1169-70 (10th Cir. 1999).  James v. Ryan, 2011 WL 4485265, *10 (D. Ariz. 2011) (same) (citing Miller, 474 U.S. at 111-12 and Lambert v. Blodgett, 393 F.3d 943, 977-78 (9th Cir. 2004).

In Ledet's case, as required by Jackson v. Denno, 378 U.S. 368 (1964), the state trial court conducted a full evidentiary hearing on the admissibility of Ledet's inculpatory statements, taking testimony from the pertinent officers, from Dr. Magann, the physician who treated Ledet, and from Ledet himself.[85]  After taking the matter under advisement,[86] the state court issued its judgment and reasons, finding:

> [T]he testimony of investigating officers and Dr. Magann negates any claim by the defendant that he was in a heavily medicated state sufficient to vitiate the voluntariness of the statements at issue.  Thus, the Court finds that the State has affirmatively proven that the confession made by the defendant was free and voluntary after having been fully advised of his Miranda rights.[87]

---

[85]St. Rec. Vol. 4 of 16, pp. 702-804.

[86]Id. at p. 807.

[87]St. Rec. Vol. 1 of 16, pp. 39-41.

While counsel did not file a writ application in connection with the district court's adverse decision, he did raise the issue on direct appeal. The Louisiana First Circuit entered its own findings, which constitute the last reasoned decision on this issue. The appeal court recognized that the trial court was in the best position to judge the credibility and weight of the testimony.[88] The appellate court considered and reviewed the evidence and testimony that was received at the suppression hearing and served as the basis of the trial court's decision.[89] After considering this evidence, the First Circuit held: "Nothing in the record before us suggests that the defendant's medicated state at the hospital was of such a degree as to negate his comprehension or make him unconscious of the consequences of what he was saying to Detectives Brown and Bergeron and Sergeant Parker."[90]

On federal habeas review, this court must presume that the factual determinations of the state courts supporting its legal conclusion were correct, including that Ledet failed to demonstrate that he was not aware of the consequences of his statements to police officials as a result of his medicated condition. To overcome the presumption of correctness as to the state court's factual findings, Ledet must rebut them by clear and

---

[88] Ledet, 2007 WL 1300819 at *8; St. Rec. Vol. 11 of 16, 2006 KA 1740, pp. 14-18.

[89] Id., at *8-10; St. Rec. Vol. 11 of 16, 2006 KA 1740, pp. 14-18.

[90] Id., at *11; St. Rec. Vol. 11 of 16, 2006 KA 1740, p. 18.

convincing evidence, which he has not done. In his federal habeas petition, Ledet merely repeats his self-serving allegation that his "drugged" state rendered his inculpatory statements involuntary. These allegations are unsupported by any evidence adduced at the motion hearing, on appeal or otherwise. Such allegations, in and of themselves, do not render Ledet's statements involuntary. Scott v. Michael, 2011 WL 1235223, *9 (E.D. La. 2011) ("statements made while the accused was in pain and/or under the influence of painkillers or other narcotics are not involuntary per se"); Reinert v. Larkins, 379 F.3d 76, 91-92 (3rd Cir. 2004), cert. denied, 546 U.S. 890 (2005) (defendant's post-surgery inculpatory statement provided while under sedation was voluntary).

The state courts' factual determinations regarding voluntariness are supported by the record. Therefore, this court on habeas corpus review must accept as conclusive the state courts' factual determination that Ledet knew the consequences of his statements. The state courts' ultimate legal conclusion that Ledet offered them voluntarily reasonably follows from these facts. Since the statements were voluntary as a matter of fact and law, harmless error analysis is unnecessary. The denial of relief on these issues is not contrary to or an unreasonable application of Supreme Court precedent. Ledet is not entitled to relief on this claim.

## X.  INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL (CLAIMS 6 and 13)[91]

Ledet argues that his trial counsel provided ineffective assistance in several respects, including counsel's alleged failures to investigate Ledet's defenses, witnesses (including character and expert witnesses) and evidence to contradict the State's case; develop a meaningful relationship with his client; object to pictures shown to the jury; exclude biased persons from the jury by using peremptory challenges; move for a mistrial; and pursue supervisory writs when the trial court denied his motion to suppress.

The standard for judging performance of counsel was established by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), in which the Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel, requiring petitioner to prove both deficient performance and resulting prejudice.  Strickland, 466 U.S. at 697.  The Supreme Court first held that "the defendant must show that counsel's representation fell below an objective standard of reasonableness."  Id. at 687-88.  Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694; United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999).

---

[91]The arguments in Ledet's Claim No. 13 under the heading "ineffective assistance of counsel" (Record Doc. No. 4-1, p. 76) will be addressed here.

In deciding ineffective assistance of counsel claims, this court need not address both prongs of the conjunctive Strickland standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. Kimler, 167 F.3d at 893. A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.' It is not enough under Strickland, however, 'that the errors had some conceivable effect on the outcome of the proceeding.'" Motley v. Collins, 18 F.3d 1223, 1226 (5th Cir. 1994) (quoting Strickland, 466 U.S. at 693).

The United States Supreme Court has recently clarified that, under Strickland, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." Harrington v. Richter, 131 S.Ct. 770, 788 (2011). The Harrington court recognized the high level of deference owed to a state court's findings under Strickland in light of the AEDPA:

> The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

"A court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." Bell v. Cone, 535 U.S. 685, 697 (2002) (citing Strickland, 466 U.S. at 689). This court must apply the "strong presumption" to counsel's strategy and tactical decisions which fall "within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 690. A "'conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.'" Johnson v. Dretke, 394 F.3d 332, 337 (5th Cir. 2004) (quoting United States v. Jones, 287 F.3d 325, 331 (5th Cir. 2002)); see also Jones, 287 F.3d at 331 ("Informed strategic decisions of counsel are given a heavy measure of deference and should not be second guessed." (quotation omitted)); Geiger v. Cain, 540 F.3d 303, 309 (5th Cir. 2008) (same). Federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise. Strickland, 466 U.S. at 689; Moore, 194 F.3d at 591.

The issue of ineffective assistance of counsel is a mixed question of law and fact. Woodfox v. Cain, 609 F.3d 774, 789 (5th Cir. 2010); Richards v. Quarterman, 566 F.3d 553, 561 (5th Cir. 2009). Thus, this court considers whether the state courts' denial of

relief was contrary to or an unreasonable application of United States Supreme Court precedent.

Ledet argues that his trial counsel was ineffective because he failed to apply to the appellate court for supervisory writs immediately after the state trial court denied his motion to suppress Ledet's inculpatory statements to police officers. However, as addressed on direct appeal in the state courts and as discussed above, Ledet's inculpatory statements were voluntary and admissible as a matter of fact and law. His argument in this regard was unsuccessful on direct appeal to the state First Circuit and would have been similarly unsuccessful if it had been brought to that same appellate court pre-trial. Counsel's decision not to assert an argument via pre-trial supervisory writ application when that same argument was ultimately found to be without merit must be viewed as a failure to pursue what would have been a futile pre-trial effort in the appellate court. A lawyer's failure to pursue meritless arguments is not constitutionally ineffective assistance of counsel. See Green v. Johnson, 160 F.3d 1029, 1037 (5th Cir.1998), cert. denied, 525 U.S. 1174 (1999) (failure to make a frivolous objection is not deficient performance below an objective level of reasonableness); Wood v. Quarterman, 503 F.3d 408, 413 (5th Cir. 2007) ("'[f]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite.'") (quoting Clark v. Collins, 19 F.3d 959, 966 (5th Cir.1994)).

Ledet also asserts that his trial counsel was ineffective because he failed to call witnesses and gather evidence that would have aided Ledet's defense. Ledet complains that two uncalled witnesses, Kevin Erickson and Pat Babin, would have testified that the State's key witness, Eugene Marcel, had a grudge against Ledet because Ledet fired him.[92] In addition to impeachment witnesses Erickson and Babin, Ledet suggests that counsel should have called the following character witnesses: Chris Richteberg, a dock foreman at the time of the incident; Tim Cemac, the tug owner; Jay Henderson, a seven-year co-worker; Father Joey Pillola, Ledet's pastor; and his friends, Jamie Lynn LeBlanc and Melanie Raines.[93] Ledet also complains that his counsel should have called a forensic expert to support his claim that the shooting was an accident.

"'Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative.'" Graves v. Cockrell, 351 F.3d 143, 156 (5th Cir. 2003) (quoting Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978)). "'Failure to present [evidence does] not constitute 'deficient' performance within the meaning of Strickland if [counsel] could have concluded, for tactical reasons, that

---

[92]Rec. Doc. 4-1, p. 37.

[93]Id. at p. 38.

45

attempting to present such evidence would be unwise.'" Williams v. Cockrell, 31 Fed.

Appx. 832 (5th Cir. 2002) (quoting Williams v. Cain, 125 F.3d 269, 278 (5th Cir. 1997)).

Ledet has not presented any proof that counsel actually did not interview these fact witnesses and did not attempt to obtain a forensic expert. It is clear that none of these witnesses saw the shooting or were aboard the vessel when the killing occurred. No evidence has been presented to support Ledet's allegations and speculation about what they might have testified. Nothing that Ledet alleges about what these witnesses might have said appears so crucial as to render counsel's failure to call them at trial constitutionally deficient. Thus, his claims in this regard are wholly speculative, and Ledet has failed to bear his burden sufficient to warrant habeas relief.

Ledet's complaint with regard to counsel's failure to submit evidence impeaching Marcel is undermined by the trial transcript of defense counsel's cross-examination of Marcel. On cross-examination, Marcel admitted he had a drug problem and that he had been convicted of two serious crimes, indecent behavior with a juvenile and burglary. Further, Marcel admitted that he had just been released from Ashland Jail in Terrebonne Parish when he began working on the tugboat.[94] The credibility of Marcel's testimony was also challenged in counsel's direct examination of Ledet. While Marcel contended that there were tensions between Ledet and the victim, Ryan Andras, Ledet testified that

---

[94]St. Rec. Vol. 3 of 16, pp. 479-80.

the victim was a good worker "in comparison to the other hand I had, which was Eugene Marcel."[95]   Ledet further stated that he liked Ryan Andras because he was a "good-hearted" person who wanted to learn and progress in this line of work and that Ledet admired that in a person.[96]

Defense counsel's performance at trial in his vigorous efforts to challenge Marcel's credibility were not constitutionally deficient.  The fact that his efforts to persuade the jury to believe Ledet, not Marcel, apparently were unsuccessful does not render his trial performance ineffective in the Sixth Amendment sense.  See Baker v. United States, 2011 WL 3841690, *13 (E.D. Va. 2011)  ("record shows . . . counsel effectively advocated on petitioner's behalf . . . [t]hus, counsel's actions were effective notwithstanding their lack of success").

Similarly, as to Ledet's claim that counsel should have obtained a forensic expert, the state district court correctly observed that Ledet has offered nothing more than "conclusory self-serving allegations" as to what a forensic expert might have provided.[97] Ledet admits that he "has no idea what evidence" a defense forensic expert would have

---

[95]St. Rec. Vol. 4 of 16, p. 620.

[96]Id. at p. 624.

[97]St. Rec. Vol. 12 of 16, District Court Ruling, p. 2.

"put forth."[98]  For reasons similar to those discussed above, this argument fails to establish grounds sufficient to warrant federal habeas relief.  See Tinsely v. Million, 399 F.3d 706, 806 (6th Cir.), cert. denied, 546 U.S.1044 (2005) (defendant presented no evidence suggesting that "there were experts to be had" who would have contradicted State's experts; "conclusory allegations that such experts exist" are insufficient to show counsel was ineffective in failing to hire a defense expert).

As to the alleged character witnesses Ledet claims his counsel should have called, it is clear that such evidence would have been merely cumulative or duplicative.  On direct examination, defense counsel attempted to show Ledet's good character, eliciting testimony that Ledet was a family man who had a wife and two children; that he had been born and reared locally in Terrebonne Parish; and that he had been on tugboats all his life, working his way up the ranks in the industry.[99]  Again, Ledet offers no evidence to support his speculative assertions that the listed character witnesses would have actually appeared for trial or about what their testimony may have been.  Given the overall content of the trial and the evidence against Ledet, I do not find that counsel was deficient in this regard and do not find that Ledet was prejudiced.  See Russell v. Lynaugh, 892 F.2d 1205, 1213 (5th Cir. 1989), cert. denied, 501 U.S. 1259, 111 S.Ct. 2909, 115 L.Ed.2d 1073 (1991)

---

[98]Rec. Doc. No. 4-1, p. 40.

[99]St. Rec. Vol. 4 of 16, pp. 615-17.

48

(character evidence described as weak when juxtaposed against overall strength of State's case). I find that the state courts' denial of relief on these issues is not contrary to or an unreasonable application of Supreme Court precedent.

Ledet also complains that his trial counsel was ineffective in failing to object to two photographs shown to the jury. One photograph depicted the exit wound on the victim and the other was a picture of how Ledet may have looked on the day of the murder. As to the exit wound photograph, Ledet does not contend that it was a misrepresentation of the victim's wound. Instead, he argues that its continual display "increased the prejudicial impact exponentially without an increase in the probative value."[100]

Under Louisiana law, "[p]hotographs which illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place or thing depicted, are generally admissible."[101] The photograph of the victim's exit wound was introduced in conjunction with the testimony of the Assumption Parish Coroner, Dr. Marie Celeste Chaudoir. In response to the prosecutor's question about the location of the gunshot wound, Dr. Chaudoir explained that the bullet "passed through the - - behind the ear and through the upper neck and bottom of the skull and out through the back of the neck."[102]

---

[100]Rec. Doc. 4-1, p. 27 (citation omitted).

[101]St. Rec. Vol. 12 of 16, District Court Ruling, p. 3 (citation omitted).

[102]St. Rec. Vol. 3 of 16, p. 508.

It was at that point that photographs of both the entrance wound and exit wound were introduced to illustrate Dr. Chaudoir's testimony regarding the bullet's path. This is a legitimate purpose and the photographs were admissible for that purpose. In addition, admission of photographs, even graphic ones, "does not offend due process when the photographs are used to add illustration to testimony describing the details of the crime . . . ." Cantu v. Quarterman, 341 Fed. Appx. 55, 62-63 (5th Cir. 2009) (citing Woods v. Johnson, 75 F.3d 1017, 1039 (5th Cir. 1996)). Thus, any objection by defense counsel to introduction into evidence and display of the photographs to the factfinder, once admitted, would have been overruled and futile. A lawyer's failure to assert a futile objection at trial is not constitutionally defective performance. See Roberts v. Thaler, 681 F.3d 597, 612 (5th Cir. 2012) (failure to lodge futile objections does not constitute ineffective assistance of counsel) (citing Koch v. Puckett, 907 F.2d 524, 527 (5th Cir. 1990)).

As to the photograph depicting what may have been Ledet's appearance on the day of the shooting, the trial transcript reflects the following exchange between Ledet and the prosecutor:

Q. Would you describe your appearance back on June 18the? How did you look? How did you appear back on June 18th?
A. Sure. I had long hair, a long goatee. That's a really bad picture.
Q. But that's how you looked?
A. No.
Q. Is that - -

50

A.  No.  I didn't have a [collar] shirt on.  That - - this picture has been modified.  That's not even me.

Q.  That's not you?

A.  I never had a [collar] shirt on back then.

Q.  You sure?

A.  Yes.  I had a [red], white and blue confederate flag tank top shirt.

Q.  So, you cannot identify that as you?

A.  No, sir, I - - don't even have my glasses on, but I can tell that's not me.

Q.  Okay.  It's not you.

A.  But, yes, I had long hair, and I had a long goatee.

Q.  You sort of looked like that then?

A.  I guess yes, sort of.[103]

I find that this inane exchange merited no objection. Ledet was in no way prejudiced by the prosecutor's use of the photograph during his cross-examination. Ledet clearly advised the jury that the person in the picture was not him.  The State did not contest Ledet's testimony in this regard.  Ledet proceeded to describe his appearance on the day of the incident, making it clear that while the picture "sort of" looked like him, it had been "modified" and it was not him.  When coupled with Ledet's explanation of his actual appearance on the day of the incident, and the fact that it was not introduced into evidence as an exhibit, use of the photograph was harmless and the lack of an objection by defense counsel was meaningless.  I find that Ledet is not entitled to relief on this claim.  Defense counsel's failure to object was not constitutionally ineffective assistance.

---

[103]St. Rec. Vol. 4 of 16, pp. 642-43.

Ledet also argues that his trial counsel was ineffective in failing to move for a mistrial or dismissal of the jury pool on grounds that the jury pool had been tainted. During voir dire, two venire members, Jolynell Creppel and David Bailey, stated that they worked for the Assumption Parish Sheriff's Office. Bailey said that he was a correctional officer.[104] Later, when venire members were asked if they knew the Ledet family, Bailey said that he knew "Louis Ledet as an inmate . . . ."[105] At that point, the court halted voir dire, conducted a bench conference and excused both Bailey and Creppel.[106]

In addressing the instant claim during the post-conviction proceedings, the state trial court determined that Ledet had failed to satisfy his burden of proof because he "has made no showing that his presumption of innocence was destroyed or that any juror was influenced by Petitioner being identified as an inmate."[107] I find that the state court's determination in this regard does not represent an unreasonable application of Supreme Court precedent.

---

[104]St. Rec. Vol. 1 of 16, pp. 186-187.

[105]Id. at p. 191.

[106]Id. at pp. 191-92.

[107]St. Rec. Vol. 12 of 16, District Court Ruling, p. 4. As noted earlier, the state supreme court and the state appellate court, by rejecting Ledet's claim without assigning reasons, implicitly found that Ledet had failed to satisfy his burden of proving he was prejudiced as a result of the venire member's comment.

In support of this claim, Ledet cites <u>Deck v. Missouri</u>, 544 U.S. 622 (2005), and

<u>State v. Murphy</u>, 463 So.2d 812 (La. App. 2d Cir. 1985).[108]  In both cases, however, the

alleged bias arose as a result of state compelled practices.  In <u>Deck</u>, the State compelled

the defendant to appear before jurors wearing shackles.  In <u>Murphy</u>, the State compelled

the defendant to appear before jurors dressed in prison garb.  Ledet's reliance on these

cases is misplaced and conflicts with the decision of the United States Supreme Court in

<u>Carey v. Musladin</u>, 549 U.S. 70, 72 (2006).  In <u>Carey</u>, the victim's family, who were

spectators in the court, wore buttons displaying a photograph of the victim.  Defense

counsel moved that the court order the family members not to wear the buttons.  The state

court denied the motion, "stating that it saw 'no possible prejudice to the defendant.'" <u>Id</u>.

at 72-73 (citation omitted).  Reviewing the state court's decision, the Supreme Court

relied upon and applied AEDPA's deferential standard of review.  Relying upon its

decisions in <u>Estelle v. Williams</u>, 425 U.S. 501, 502 (1976), and <u>Holbrook v. Flynn</u>, 475

U.S. 560, 562 (1986), the Supreme Court observed that "[b]oth <u>Williams</u> and <u>Flynn</u> dealt

with government-sponsored practices," and recognized that it had never addressed a jury

inflammation due process claim in the context of courtroom conduct <u>not</u> sanctioned by

the State.  <u>Id</u>. at 75A-76B.  Thus, the Court concluded that the state courts, in denying

habeas relief, did not unreasonably apply "clearly established Federal law. § 2254(d)(1)."

---

[108]Rec. Doc. No. 4-1, p. 33.

Id. at 77.  Since Ledet's argument concerning alleged contamination of jury impartiality deals with individual conduct rather than state compelled conduct, his reliance on the decisions he has cited is inapposite.

More directly on point is the decision of the Seventh Circuit in Bowie v. Thurmer, 342 Fed. Appx. 200 (7th Cir. 2009), cert. denied, _ U.S. _, 130 S.Ct. 1099 (2010), a case with facts similar to those in the instant case.  In Bowie, a prospective juror, who worked as a correctional officer at a local jail, expressed doubt over his ability to be fair and impartial, stating: "'May have served - I don't know if I served [Bowie] breakfast, but I'm around him all the time, around the inmates, and you hear all the different stories.'" Id. at 204 (emphasis added).  At that point, the trial judge stopped the prospective juror from speaking further and granted defense counsel's motion to strike him for cause.  After his conviction, Bowie argued that his counsel was ineffective in failing to strike the entire jury panel.  Bowie was denied relief by the state courts.  Upon federal habeas review, Bowie argued that the prospective juror's comment "created an unreasonable risk that the jury would be unable to apply the presumption of innocence," Id. at 204 (citing Estelle v. Williams).

The Seventh Circuit distinguished Estelle from Bowie's situation, finding that the Estelle Court had been concerned with the "continuing influence" on jurors presented by the extended time defendant had appeared before them dressed in prison garb.  The

Seventh Circuit observed: "Estelle holds that a defendant's right to due process is violated only when the state compels [the conduct]. There is no issue of compulsion here." Bowie, 342 Fed. Appx. at 205 (emphasis original) (citation omitted).

The Seventh Circuit found that Bowie had failed to satisfy his burden of proof, taking into account the following factors: (1) The court immediately silenced the [prospective] juror after he made the statement. (2) The impact of the prospective juror's inference that Bowie "had been or was incarcerated" was diminished by the fact that Bowie raised the inference himself by testifying about his prior convictions. (3) Even if Bowie had not raised the inference himself, jurors "'are likely to presume that a criminal defendant, irrespective of his guilt or innocence, has spent at least some time in custody as a result of being charged with a crime.'" Id. (quoting Burton v. Renico, 391 F.3d 764, 778 (6th Cir. 2004)). The court concluded: "On these facts, it was hardly unreasonable for the state court to conclude that Bowie was not prejudiced by his counsel's failure to move to strike the entire jury panel." Id.

The mitigating factors upon which the Bowie court relied are also present in the instant case. The trial judge stopped venireman David Bailey from speaking further. She halted the proceedings, called a bench conference, then excused both Bailey and the other employee of the parish sheriff's office. The impact of Bailey's statement that Ledet had been an inmate was diminished by the fact that Ledet himself testified during trial about

his prior convictions.[109]  Finally, jurors sitting in the trial of a serious charge such as second degree murder are reasonably likely to assume, irrespective of his guilt or innocence, that Ledet had spent some time in custody.

I find that the state trial court's determination that "Petitioner has made no showing that his presumption of innocence was destroyed or that any juror was influenced by Petitioner being identified as an inmate"[110] was not an unreasonable application of clearly established federal law.  This claim does not warrant federal habeas relief.

Ledet also argues that his counsel was ineffective in failing timely to seek supervisory writs to review the trial court's denial of his motion to suppress his inculpatory statements.  The state trial court denied Ledet's motion to suppress on August 25, 2004.[111]  On September 23, 2004, counsel file a notice of intent to seek a writ of review concerning the trial court's order.[112]  On September 27, 2004, the court set a return date of October 25, 2004.[113]  On October 26, 2004, defense counsel submitted via fax a

---

[109]Ledet admitted that he had two prior convictions. One was a DWI conviction in the 1980s, followed by another DWI conviction in 1991.  St. Rec. Vol. 4 of 16, p. 616.

[110]St. Rec. Vol. 12 of 16, District Court Opinion, p. 4.

[111]St. Rec. Vol 1 of 16, pp. 39-41.

[112]Id. at p. 42.

[113]Id. at p. 43.

motion to extend his return date.[114]  On October 29, 2004, the state trial court extended his time to November 10, 2004.[115]  However, the Louisiana First Circuit refused to consider counsel's writ application because his request for an extension of his return date was filed untimely.[116]

Ledet's ineffecive assistance argument on this point is without merit for the following reasons.  First, the record establishes that Ledet was <u>not</u> prevented from filing a pre-trial supervisory writ application with the Louisiana First Circuit.  While the state appellate court refused to consider counsel's initial writ application, the appellate court provided that if counsel elected to file a new application, "the application must be filed on or before January 24, 2005."[117]  On January 21, 2005, counsel in fact filed a writ application pursuant to <u>that</u> order.[118]  The First Circuit considered and ultimately denied it.[119]  Second, the issue of whether Ledet's motion to suppress should have been granted was brought before the appellate court a second time, on direct appeal.  The First Circuit

---

[114]<u>Id</u>. at p. 46.

[115]<u>Id</u>. at p. 46.

[116]<u>Id</u>. at p. 61.  The appellate court, in support of its decision, set forth two additional bases, neither of which are at issue in connection with the instant claim.

[117]<u>Id</u>.

[118]St. Rec. Vol. 10 of 16, 2005 KW 0157.

[119]St. Rec. Vol. 1 of 16, p. 52, 1st Cir. Order, 2005 KW 0157, 3/21/05.

denied the claim again, stating: "Nothing in the record before us suggests that the defendant's medicated state at the hospital was of such a degree as to negate his comprehension or make him unconscious of the consequences of what he was saying to Detectives Brown and Bergeron and Sergeant Parker."[120]

Ledet's counsel vigorously attempted to pursue appellate court review of the denial of his motion to suppress, both pre-trial and on direct appeal. Although his attempts were unsuccessful, his representation of his client on this issue was in no way constitutionally deficient. I find that Ledet's claim in this regard is without merit.

## XI. ASSISTANCE OF APPELLATE COUNSEL (CLAIM 7)

Like Ledet's claims concerning the performance of his trial counsel, his complaint about his appellate counsel are subject to the Strickland standard outlined above. Ledet offers two arguments in support of this claim. First, Ledet complains that appellate counsel failed to raise the insufficiency of evidence claim "in a manner beneficial to the defendant." Ledet asserts that appellate counsel argued that there was insufficient evidence to support his second degree murder conviction because he acted "in sudden passion or heat of blood." He asserts that appellate counsel should have argued that there

---

[120]Id. at *11; St. Rec. Vol. 11 of 16, 2006 KA 1740, p. 18.

was insufficient evidence because the shooting was an accident and Ledet had no intent to kill the victim.[121]

Ledet has mischaracterized counsel's argument. His counsel's appellate brief contains no mention that Ledet acted "in sudden passion or heat of blood." Instead, counsel provides several arguments in support of his contention, which he repeats at least four times, that the shooting was "unintentional and accidental."[122]

Ledet also complains that appellate counsel was ineffective in failing to raise claims which were subsequently addressed during his post-conviction proceeding. The record is clear however, that all such claims, identified as claims (8) through (13) in this court, were in fact addressed on the merits in his post-conviction proceedings. Ledet provides no argument as to why he was prejudiced by the fact that the issues were adjudicated in his post-conviction proceedings rather than on direct appeal.

Ledet's claim that his appellate counsel provided ineffective assistance is therefore baseless. I find that this claim provides <u>no</u> basis upon which federal habeas corpus relief might be warranted.

---

[121]Rec. Doc. 4-1, p. 48.

[122]St. Rec. Vol. 11 of 16, Original Appellant Brief on Behalf of Defendant Louis Ledet, pp. 13-15.

## XII.   JURY BIAS (CLAIMS 6-E AND 8)

Ledet contends that his constitutional rights were violated because (a) his trial counsel failed to challenge several venire members, who were allowed to serve on his jury, (b) resulting in the seating of a jury that was not fair and impartial. Ledet's contention is based upon the following inquiries and responses during jury selection and voir dire to the following members of the jury: (1) Harold Aucoin, (2) Stephen Patterson, (3) Robert Barbier, (4) Charles Patton, (5) Woodrow Oubre, (6) Carl Gaudet, (7) Sonya Aucoin, (8) Frank Harvey, (9) Charles Boudreaux, (10) Patti Medine, and (11) Reba Arceneaux.[123]

Defense counsel asked whether, if the jurors had <u>one</u> reasonable doubt, they could render a verdict of not guilty.[124]  Aucoin, Patterson and Barbier answered that they were "not sure."[125] Defense counsel asked whether the jurors's decision would be impartial if there was evidence that Ledet had cocaine in his system when the shooting occurred. Patton said, "I know it impairs your judgment.[126]  Oubre and Gaudet said it was

---

[123]Rec. Doc. No. 4-1, pp. 28-29; pp. 50-53.

[124]St. Rec. Vol. 2 of 16, pp. 232 and 321.

[125]<u>Id</u>. at pp. 233-36.  Two other jurors, Frank Harvey and Clementine Converse, expressed uncertainty, but Ledet states that Harvey and Converse were "rehabilitated."  Rec. Doc. No. 4-1, p. 29. Additionally, Ledet challenges jurors Charles Boudreaux and Patti Medine based upon the assertion that they failed to provide answers. Rec. Doc. No. 4-1, p. 53.  However, the transcript reflects that both were asked whether they could render a not guilty verdict if they had <u>one</u> reasonable doubt, and both responded that they could.  <u>See</u> St. Rec. Vol. 2 of 16, pp. 207-08.

[126]St. Rec. Vol. 2 of 16, p. 226.

"possible" that their decision might be affected.[127]  Defense counsel later asked whether the jurors would be more inclined to rule in favor of the State if they learned that cocaine was found in defendant's system at the time of the incident.  Aucoin responded "I might, yes."[128]  In response to counsel's question whether anyone had been the victim of a crime, Patton and Arceneaux answered positively,[129] but both also stated that their experiences would not affect their ability to be fair and impartial jurors.[130]  In response to counsel's question as to whether anyone knew any of the trial witnesses, Barbier and Patton said they knew Lieutenant Lonnie Mabile.[131]  Both stated that they did not have a close relationship with Lt. Mabile and that they would not be more inclined to believe Mabile because they knew him.[132]

In discussing the AEDPA deferential standard of review in the context of a claim of jury bias, the United States Court of Appeals for the Fifth Circuit has stated:

---

[127]Id. at p. 226-27.

[128]Id. at 315.

[129]Patton had been the victim of simple theft.  St. Rec. Vol. 1 of 16, p. 196.  Arceneaux was a bank teller when the bank was robbed.  St. Rec. Vol. 2 of 16, p. 288.

[130]St. Rec. Vol. 1 of 16, p. 197; St. Rec. Vol. 2 of 16, pp. 289-90.

[131]Ledet also lists Charles Boudreaux as one of the jurors who stated he knew a trial witness. However, the transcript contains no such testimony from Charles Boudreaux. Ledet contends that Patton's bias in this regard was exacerbated by the fact that Patton was a private investigator and had "regular close contact with police officials."  Rec. Doc. 4-1, p. 53.

[132]St. Rec. Vol. 2 of 16, pp. 214-217.

Juror bias <u>vel</u> <u>non</u> is a finding of fact. Pursuant to AEDPA, "a determination of a factual issue made by a state court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by <u>clear and convincing evidence</u> ". 28 U.S.C. § 2254(e)(1) (emphasis added). Accordingly, . . . to succeed on his juror-bias claim, [defendant] must show "the adjudication of the claim [on the merits in a State court proceeding] . . . resulted in a decision that was based on an <u>unreasonable</u> determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2) (emphasis added).

<u>White v. Quarterman</u>, 275 Fed. Appx. 380, 381 (5th Cir.), <u>cert.</u> <u>denied</u>, 555 U.S. 999 (2008) (citations omitted).

In <u>White</u>, as in the instant case, the state district court determined that the defendant's jury bias claim was without merit because he had failed to satisfy his burden of proof.[133] Thereafter, the state high court in <u>White</u>, like the Louisiana Supreme Court in the instant matter, rejected the claim without assigning reasons. <u>Id</u>. Thus, the Fifth Circuit could "assume the state [trial] court applied the proper law and then determine whether its decision was contrary to or an objectively unreasonable application of that law." <u>Id</u>. (quotation omitted). Based on the state high court's rejection of the jury bias claim, the Fifth Circuit concluded that White had failed to prove his claim and that this "implied factual finding is entitled to deference." <u>Id</u>. (citing 28 U.S.C. § 2254(d)(2), (e)(1); <u>Valdez v. Cockrell</u>, 274 F.3d 941, 948 n. 11 (5th Cir. 2001)). Thus, to attain

---

[133]In the instant case, the state trial judge found that Ledet "has shown no error on the part of counsel and has also shown no prejudice as a result of the alleged error." St. Rec. Vol. 12 of 16, Ruling on Petitioner's Application for Post Conviction Relief, 2/5/10 at pp. 3-4.

federal habeas relief, "[the defendant] must rebut these state-court factual findings by clear and convincing evidence." Id. (citing 28 U.S.C. § 2254(e)(1)).

In determining whether White had satisfied his heavy burden of proof, the Fifth Circuit examined cases in which jury bias had been found. In Virgil v. Dretke, 446 F.3d 598, 604 (5th Cir. 2006), a juror was asked whether he could be "fair and impartial." The juror said no. White, 275 Fed. Appx. at 382. In determining that the juror had admitted bias, the Fifth Circuit "focused on the phrase 'fair and impartial,' stating: '[The juror's] unchallenged statements during voir dire that [he] could not be fair and impartial obligated Virgil's counsel to use a peremptory or for-cause challenge.'" White, 275 Fed. Appx. at 382-83 (quotation omitted). Similarly, in United States v. Nell, 526 F.2d 1223, 1228 (5th Cir. 1976), the challenged juror twice stated that he disliked unions, explaining that his second statement "just reiterates my prejudice...." (Emphasis added). In determining that the juror was biased and the trial court erred in not dismissing him for cause, the court "focused on the juror's use of 'prejudice,' concluding: '[The juror's] articulated responses left no doubt as to his prejudice.'" White, 275 Fed. Appx. at 383 (quoting Nell, 526 F.2d at 1230).

In the instant case, as in White, the challenged jurors never expressed any prejudice against Ledet, nor did they state they could not be fair and impartial.[134] Their

---

[134]As noted above, when two of the challenged jurors, Charles Patton and Reba Arceneaux, were expressly asked whether they could be fair and impartial, they both responded that they could be.

responses were more akin to the three <u>Virgil</u> jurors' negative responses when asked

whether a witness with a prior criminal case was "worthy of belief." <u>Virgil</u>, 446 F.3d at

608. In finding that the three jurors were not biased, the court reasoned:

> [T]he Supreme Court has never required that jurors come ready to serve
> with a blank slate, without preconception or understanding of the real
> world. As the Supreme Court noted in [<u>Irvin v. Dowd</u>], To hold that the
> mere existence of any preconceived notion as to guilt or innocence of an
> accused, without more, is sufficient to rebut the presumption of a
> prospective juror's impartiality would be to establish an impossible
> standard....[135]

<u>Virgil</u>, 446 F.3d at 609 (footnote original).

Applying the foregoing standards, I find that the state courts' rejection of Ledet's

jury bias claim is not an unreasonable application of Supreme Court precedent. On the

contrary, the state courts' determination of the jury bias claim was entirely consistent

with federal constitutional law. His trial counsel was not ineffective in failing to

challenge jurors who had exhibited no demonstrable bias. Ledet's claims that his jury

was biased and that his counsel's deficient performance contributed to that result are

meritless and do not support federal habeas relief.

---

[135]366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); <u>see also</u> <u>Delaware v. Van Arsdall</u>,
475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) ("[T]he Constitution entitles a criminal
defendant to a fair trial, not a perfect one.")

## XIII.  DR. WILLIAM NEWMAN'S TESTIMONY (CLAIM 9)

Ledet contends that his right to due process was violated when the trial court allowed Dr. William Newman, the State's forensic pathologist, to testify about Ledet's intent, a necessary element to prove him guilty of second degree murder and an ultimate issue to be resolved by the jury.  The trial transcript reflects that during his examination of the victim's body, Dr. Newman observed "a muzzle imprint on the skin, which means that the muzzle of the gun was tight against the skin."[136]  Thereafter, the prosecutor asked whether there was anything to indicate that the shooting was accidental.  Dr. Newman responded that "generally gunshot wounds that are accidental are usually not tight contact types of gunshot wounds."[137]

This issue presents a mixed question of law and fact.  My research has uncovered no case law specifically categorizing this precise issue as one presenting a mixed question of law and fact.  However, like similar issues concerning the admissibility of evidence, I conclude that it presents a mixed question.  Livingston, 107 F.3d at 309.

In addressing this matter during post-conviction proceedings, the state district court denied relief, finding that "Dr. Newman's testimony was not testimony regarding

---

[136]St. Rec. Vol. 3 of 16, p. 525.

[137]St. Rec. Vol. 3 of 16, p. 529.

the ultimate issue of Petitioner's guilt prohibited by La. C.E. art. 704."[138]  I find the district court's finding in this regard correct.  Dr. Newman expressed no opinion with respect to Ledet's intent.  He expressed no opinion as to whether Ledet was guilty as charged.  Those issues were properly reserved for the jury.  His testimony was nothing more than an expert assessment of the physical ramifications of the factual evidence he had observed, not a statement reflecting in any way his thoughts on Ledet's state of mind.

In the factually similar case of Moses v. Payne, 555 F.3d 742, 745 (9th Cir. 2009), the petitioner alleged that his wife, the victim, committed suicide.  The medical examiner opined that the victim's death was a homicide based in part upon his observation that the victim suffered a "contact wound."  Id. at 747.  A ballistics expert testified that the victim's death "was more likely a homicide than either a suicide or an accidental shooting during a struggle over the gun," based on his analysis of "the same objective factors" considered by the medical examiner.  Id.  The Ninth Circuit concluded that these experts' testimony did not improperly intrude upon the province of the jury.  Neither expert testified that the defendant murdered the victim.

---

[138]St. Rec. Vol. 12 of 17, District Court Opinion, p. 5.  Article 704 provides, in pertinent part, that an expert witness in a criminal case "shall not express an opinion as to the guilt or innocence of the accused."

Contrary to Ledet's contention, which is simply erroneous, Dr. Newman did not express an opinion as to Ledet's intent and/or guilt. That issue was properly reserved for the jury, and this claim provides no basis for federal habeas relief.

## XIV.   DR. MARIE CHAUDOIR'S TESTIMONY (CLAIM 10)

At trial, Dr. Marie Chaudoir, the Assumption Parish Coroner, offered her expert opinion concerning the manner of the victim's death, testifying that "[i]t was a homicide."[139] Ledet contends that Dr. Chaudoir's testimony in that regard was hearsay and a denial of his constitutional right of confrontation. The basis of Ledet's claim is that Dr. Chaudoir did not conduct her own investigation to conclude that the shooting was a homicide. Instead, he argues that she based her opinion on what investigating officer Louis Lambert told her and upon her review of the autopsy protocol performed by Dr. Newman. [140]

This issue presents a mixed question of law and fact. See Livingston, 107 F.3d at 309 (admissibility of evidence); Lilly v. Virginia, 527 U.S. 116, 136, 148 (1999) ("Deciding whether a particular statement bears the proper indicia of reliability under our Confrontation Clause precedent 'may be a mixed question of fact and law,' but the mix

---

[139]St. Rec. Vol. 3 of 16, p. 516.

[140]St. Rec. Vol. 3 of 16, pp. 518 and 520.

weighs heavily on the 'fact' side."); accord Fratta v. Quarterman, 536 F.3d 485, 499 (5th Cir. 2008).

As discussed above, habeas review is limited to questions of constitutional dimension, and federal courts generally do not review the admissibility of evidence under state law. Jernigan, 980 F.2d at 298. To whatever extent, therefore, that Ledet argues that Dr. Chaudoir's testimony was inadmissible under state law, this court will not review such a claim. Instead, the court will consider whether the admission of Dr. Chaudoir's testimony violated Ledet's due process rights and/or the Confrontation Clause.

Due process considerations include both procedural and substantive components. As to procedural due process, this court considers "whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." Swarthout, 131 S.Ct. at 861 (citing Ky. Dept. Of Corr. V. Thompson, 490 U.S. 454, 460 (1989)). Thus, as to procedural due process, the court must consider whether Louisiana law provided Ledet with a protected interest in having Dr. Chaudoir's testimony precluded from his trial. As to substantive due process, the court considers whether the allegedly erroneous admission of Dr. Chaudoir's testimony rendered Ledet's trial fundamentally unfair. Roberts v. Thaler, 681 F.3d 597, 611 (5th Cir. 2012) (the introduction of evidence violates the Due Process Clause of the Fourteenth Amendment if it is so unduly prejudicial that it renders

the trial fundamentally unfair) (quotation omitted); <u>Riggins v. Nevada</u>, 504 U.S. 127, 149 (1992) (the Due Process Clause guarantees fundamental fairness in a criminal trial) (quotation omitted).

In this case, because Dr. Chaudoir's testimony was not hearsay, no procedural due process violation could conceivably occur. Under Louisiana law, "[h]earsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La. Code Evid. Art. 801(C). In this case, Dr. Chaudoir's testimony made no express reference to any out-of-court statement by any declarant other than herself. The statement that the shooting was a homicide was made by Officer Louis Lambert. Officer Lambert testified at trial and was subject to defense counsel's cross-examination. The same is true for Dr. Newman, upon whose report Dr. Chaudoir relied in providing her own in-court statement that the incident was a homicide. In these circumstances, no procedural due process violation occurred. Louisiana's evidentiary law concerning hearsay and its application are clearly constitutionally sufficient.

Similarly, no violation of Ledet's substantive due process rights can be found in these circumstances. Dr. Chaudoir's opinion testimony was merely cumulative of Dr. Newman's testimony and other substantial, non-opinion evidence in the case that the victim's death appeared to be a homicide. The admission of Dr. Chaudoir's testimony,

the kind of evidence ordinarily and commonly received from the parish coroner in a fatality trial, did not render Ledet's trial fundamentally unfair.

As to Ledet's confrontation of witnesses argument, the Confrontation Clause prohibits admission of "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 53-54 (2004) (emphasis added); see Melendez-Diaz v. Massachusetts, 557 U.S. 305, 310-11 (2009) (expert report is "functionally identical" to testimonial statement and, therefore, not admissible when expert does not appear at trial and defendant has not had prior opportunity for cross-examination); Bullcoming v. New Mexico, _ U.S. _, 131 S.Ct. 2705, 2713 (2011) (fact that expert who neither participated in nor observed testing or examination testified, rather than expert who actually performed testing or examination, constituted a violation of defendant's right of confrontation).

All three witnesses whose statements and testimony are the subject of this claim were available and appeared at trial. Officer Lambert, whose statement was given to Dr. Chaudoir, and Dr. Newman, upon whose report Dr. Chaudoir relied, both testified at trial, and Ledet's counsel had an opportunity to cross-examine them. Dr. Chaudoir herself was vigorously cross-examined by defense counsel.[141] Under no circumstances could it

---

[141]St. Rec. Vol. 3 of 16, pp. 516-18.

reasonably be concluded that Ledet's rights under the Confrontation Clause were violated in any way. Ledet is not entitled to federal habeas corpus relief on this claim.

## XV. PROSECUTORIAL MISCONDUCT (CLAIMS 11 AND 13)[142]

Ledet contends that he was denied due process by virtue of the prosecutor's improper actions. He asserts that the prosecutor's misconduct began when he argued that the defense was only entitled to six (6) peremptory challenges. Thereafter, the prosecutor's "improper actions came in the form of witnesses called . . . whose testimony was either misleading or marginally relevant."[143] Ledet alleges "overzealous" prosecution in that witnesses were questioned not to obtain the truth, but instead to procure a version of events which would support a charge of second degree murder.[144]

A claim of prosecutorial misconduct presents a mixed question of law and fact. Brazley v. Cain, 35 Fed. Appx. 390, *4 n.4 (5th Cir.), cert. denied, 537 U.S. 912 (2002) (citing United States v. Emueqbunam, 268 F.3d 377, 403-04 (6th Cir. 2001); Jones v. Gibson, 206 F.3d 946, 958 (10th Cir. 2000); United States v. Noriega, 117 F.3d 1206, 1218 (11th Cir. 1997); United States v. Spillone, 879 F.2d 514, 520 (9th Cir. 1989)).

---

[142]The portion of Ledet's catchall Claim No. 13 labeled "Overzealous Prosecution" (Rec. Doc. 4-1, p. 75), is addressed at this juncture of my report and recommendation.

[143]Rec. Doc. 4-1, p. 61.

[144]Id. at pp. 75-76.

A prosecutor's alleged misconduct does not present a claim of constitutional magnitude in a federal habeas action unless it is so prejudicial that the state court trial was rendered fundamentally unfair in violation of due process. Jones v. Butler, 864 F.2d 348, 356 (5th Cir.1988), cert. denied, 490 U.S. 1075 (1989). Due process requires reversal when the prosecutor's actions "so infect the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986); Rogers v. Lynaugh, 848 F.2d 606, 608 (5th Cir. 1988); Bell v. Lynaugh, 828 F.2d 1085, 1095 (5th Cir. 1987). The prosecutor's actions must be evaluated in the context of the entire trial. Greer v. Miller, 483 U.S. 756, 765-66 (1987) (citing Darden, 477 U.S. at 179); Kirkpatrick v. Blackburn, 777 F.2d 272, 281 (5th Cir. 1985). "[I]t 'is not enough that the prosecutors' remarks [or actions] were undesirable or even universally condemned.' The relevant question is whether the prosecutors' comments [or conduct] 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden, 477 U.S. at 181 (citations and quotations omitted).

In the Fifth Circuit, courts must apply a two-step analysis in reviewing claims of prosecutorial misconduct. United States v. Wise, 221 F.3d 140, 152 (5th Cir. 2000); United States v. Lankford, 196 F.3d 563, 574 (5th Cir. 1999). First, the court must determine whether prosecutorial conduct was improper. Wise, 221 F.3d at 152. If so, the second step is to evaluate whether it "affected the substantial rights of the defendant." Id.

A petitioner "must demonstrate that the misconduct [was] persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction would not have occurred but for the improper remarks." Jones v. Butler, 864 F.2d at 356; Hogue v. Scott, 874 F. Supp. 1486, 1533 (N.D. Tex. 1994). Under this test, a petitioner must demonstrate that the comment rendered his trial "fundamentally unfair," by showing "a reasonable probability that the verdict might have been different had the trial been properly conducted." Rogers, 848 F.2d at 609 (footnote and citations omitted).

Analyzing the foregoing standards, I find that Ledet suffered no fundamental unfairness during voir dire proceedings. The district court clearly and correctly rejected the prosecutor's argument and provided defense counsel with 12 peremptory challenges.[145]

As for the allegedly improper witnesses the prosecutor called to the stand, Ledet claims that the testimony of Eugene Marcel, Dr. Chaudoir and Alvin Dardar was not credible and that the State, in the case of Marcel and Dardar, acted improperly in procuring their unbelievable testimony. I have already addressed above and rejected Ledet's complaints about these witnesses. Their credibility required evaluation by the jury, which clearly accepted some or all of their testimony, as a factfinder is entitled to

---

[145]St. Rec. Vol. 2 of 16, p. 261. La. Code Crim. P. art. 799.

do.  There was no prosecutorial misconduct in giving the jury an opportunity to perform its rightful function.

Ledet also complains that witness Richard Torbert offered inconsistent testimony. In his initial statement, Torbert stated that when he arrived on the scene, Ledet "was running around on the deck."  At trial, Torbert testified that Ledet "was standing in the door of the wheelhouse."[146]  While Ledet suggests that Torbert's initial account was better for the defense because it reflected that he was in a panic over what had occurred, even Ledet characterizes the difference as "minor."[147]  Again the impact of this inconsistency and the weight or credibility to be assigned Torbert's testimony was a jury function, and no prosecutorial misconduct can conceivably be found in these circumstances.

The transcript reflects that the prosecutor did not vouch for the credibility of any of these witnesses.[148]  The witnesses were called, a full opportunity to address any issues relating to their credibility was provided in cross-examination, and the jury was properly allowed to assess the credibility and weight to be given to this testimony.  I find the State

---

[146]Rec. Doc. No. 4-1, p. 66.

[147]Id.

[148]See United States v. Ajaegbu, 139 F.3d 898 (5th Cir. 1998) (per curiam) (citing United States v. Carter, 953 F.2d 1449, 1460 (5th Cir. 1992)) (prosecutor cannot vouch for a witness's credibility because it implies that he has additional personal knowledge about the witness which he has garnered from an extrajudicial investigation).

did not act improperly in this regard and Ledet suffered no violation of his right to due process. Ledet has failed to satisfy his burden of proof, failing to show the prosecutor's actions rendered his trial fundamentally unfair.

## XVI.  BENCH CONFERENCES NOT TRANSCRIBED (CLAIM 12)

Ledet contends that he was denied due process because three bench conference discussions were not transcribed. Ledet's claim appears to present a mixed question of fact and law, since the factual bases of the bench conferences must be reviewed and a legal determination made as to whether the absence of bench conference transcripts violated Ledet's constitutional rights.[149]

It is indisputably true that a criminal defendant has the right to an adequate review of his conviction, i.e., a sufficiently complete record. Mayer v. City of Chicago, 404 U.S. 189, 198 (1971). However, the Supreme Court has not held that due process requires a verbatim transcript of the entire proceedings or that an incomplete record confers automatic entitlement to relief. Fahy v. Horn, 516 F.3d 169, 190 (3rd Cir. 2008) (citing Scott v. Elo, 302 F.3d 598, 604 (6th Cir. 2002), cert. denied, 537 U.S. 1192 (2003) (federal habeas relief will be granted only upon a showing of prejudice resulting from a missing transcript) (other citations omitted).

---

[149]I have located no case law expressly addressing whether an alleged constitutional violation based upon the absence of transcribed bench conferences represents a question of fact, question of law or mixed question of fact and law for habeas review purposes.

One of the untranscribed bench conference took place after venire member, David Bailey, stated that he knew Ledet because Ledet was an inmate.  Immediately after Bailey's statement, the state trial judge called for a bench conference and excused both Bailey and another venire member.  Ledet argues that during that conference, defense counsel asserted that the entire jury panel should be excused because it was tainted.  As discussed above, no error of constitutional magnitude occurred in the trial court's decision not to excuse the entire panel. Ledet fails completely to show how he was prejudiced by the fact that the discussion was not transcribed.  It is evident, based upon the judge's ruling, that counsel's argument, if any, was denied, and that the correct decision to excuse only two potentially biased jurors was made.  Further, the lack of a transcript of this bench conference did not prevent Ledet from raising the matter in his post-conviction proceedings.

Another untranscribed bench conference concerned defense counsel's argument that Dr. Newman could not provide testimony regarding Ledet's intent.  However, as discussed above, Dr. Newman did not offer testimony regarding Ledet's intent, and Ledet has had a full and fair opportunity to litigate this issue at every step of his proceedings.  Thus, Ledet suffered no prejudice.

Finally, Ledet complains that the bench conference at which defense counsel objected to Eugene Marcel being called as a witness should have been transcribed.

However, before trial, a full hearing was conducted regarding whether Marcel could offer testimony at trial. The hearing was transcribed. The transcript reflects that Ledet was present at the hearing.[150] Both Ledet and the court had the benefit of hearing counsel's full argument as to why Marcel should not be allowed to testify, and the argument was transcribed for Ledet's use in his post-conviction proceedings. Ledet has made no showing that he was prejudiced because the bench conferences were not transcribed. In the absence of such a showing, federal habeas corpus relief is not warranted.

## RECOMMENDATION

For all of the foregoing reasons, it is **RECOMMENDED** that the petition of Louis Ledet for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v.

---

[150]St. Rec. Vol. 1 of 16, p. 124.

<u>United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[151]

New Orleans, Louisiana, this ____1st____ day of October, 2012.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[151]<u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.